**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IRIS KIRKLAND, | ) | CASE NO. 1:17CV01665 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Iris Kirkland ("Plaintiff" or "Kirkland"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I. PROCEDURAL HISTORY

In May 2014, Kirkland filed an application for POD, DIB, and SSI alleging a disability onset date of February 20, 2014 and claiming she was disabled due to asthma, L4-5 disc problems, back arthritis, sciatica, and migraines. (Transcript ("Tr.") at 9, 173-175, 179-185, 208.) The applications were denied initially and upon reconsideration, and Kirkland requested a hearing before an administrative law judge ("ALJ"). (Tr. 125.)

On February 18, 2016, an ALJ held a hearing, during which Kirkland, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 24-68.) On May 25, 2016, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 6-23.) The ALJ's decision became final on June 14, 2017, when the Appeals Council declined further review. (Tr. 1.)

On August 9, 2017, Kirkland filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13 & 14.) Kirkland asserts the following assignments of error:

> (A) Were the ALJ's physical and/or mental residual functional capacity findings contrary to law and/or not based upon substantial evidence?
>
> (B) Was the ALJ's Step 5 finding contrary to law and/or not based upon substantial evidence?

(Doc. No. 13 at 1.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Kirkland was born in April 1968 and was 47 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations. (Tr. 71.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has a high school education and is able to

communicate in English.  (Tr. 76.)  She has past relevant work as a stocker/laborer, production assembler, and machine operator/feeder.  (Tr. 17.)

## B.     Medical Evidence[2]

### 1.      Mental Impairments

Kirkland was psychiatrically hospitalized from June 22 through June 29, 2015, after reporting severe depression and suicidal ideation.  (Tr. 463.)  At that time, she was under  high levels of stress due to her financial and medical condition.  (Tr. 469.)  She denied manic symptoms or current psychological treatment.  (Tr. 469, 470.)  Psychiatrist Robert T. Rowney, M.D., diagnosed her with major depressive disorder and assigned her a Global Assessment of Functioning ("GAF") score[3] of 40.  (Tr. 468-469.)  During her hospitalization, Kirkland participated in group therapy and began taking an antidepressant.  (Tr. 475.)  She improved with

---

[2]     The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the Parties' Briefs.  The Court further notes both Kirkland and the Commissioner have cited generally to large swaths of evidence in their briefs.  (*See* Doc. No. 13 at 2, 4, 5; Doc. No. 14 at 8.) This does not comply with the Court's Order, which specifically provides the briefs "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue.  (Doc. No. 4 at 3.)  Thus, the Court will only discuss evidence which has been cited by the parties with specificity, as required by this Court's Order.

[3]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

treatment and was discharged with a GAF score range of 60-51, indicating moderate symptoms. (Tr. 490, 494.)

On July 8, 2015, Kirkland saw psychiatrist Louis Klein, M.D., for treatment. (Tr. 409.) She reported her new medications improved her depression and anxiety. (*Id*.) Dr. Klein diagnosed major depressive disorder and panic disorder with agoraphobia. (Tr. 411, 412.) He assigned a GAF score of 40. (Tr. 412.)

Kirkland returned to Dr. Klein on August 17, 2015. (Tr. 447.) She indicated she was possibly moving in with her father and undergoing back surgery. (*Id*.) Dr. Klein noted Kirkland's affect was brighter. (Tr. 449.)

On November 2, 2015, Kirkland informed Dr. Klein she did not move in with her father and was living with friends. (Tr. 452.) On December 7, 2015, she indicated her Thanksgiving was "enjoyable because she was alone and cooked for herself." (*Id*.) She continued to reside with friends, but was working with a counselor on obtaining housing. (*Id*.)

On February 8, 2016, Dr. Klein filled out a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" regarding Kirkland. (Tr. 830-832.) He found Kirkland had mild limitations in the following areas:

- Understanding, remembering, and carrying out simple instructions;

- Making judgments on simple work-related decisions; and

- Interacting appropriately with co-workers.

(Tr. 830-831.) Dr. Klein found moderate limitations in the following areas:

- Understanding, remembering, and carrying out complex instructions;

- Making judgments on complex work-related decisions;

- Interacting appropriately with the public and supervisors; and

- Responding appropriately to usual work situations and to changes in a routine work setting.

(*Id.*)  When asked to identify the factors which supported these limitations, Dr. Klein noted they were "based on patient's description."  (*Id.*)

## 2.      Physical Impairments

On March 21, 2014, Kirkland visited the emergency room for buttock pain radiating into her left thigh.  (Tr. 255.)  On examination, she had tenderness and pain in her lumbar spine.  (Tr. 257.)  The emergency room physicians administered a Toradol injection and prescribed Meloxicam and Tramadol.  (Tr. 254.)

Kirkland returned to the emergency room with similar symptoms on March 24, 2014. (Tr. 267.)  She indicated her back pain was precipitated by fall a week prior.  (Tr. 269.)  She reported her back pain was radiating down her left leg and she was unable to ambulate due to the pain.  (*Id.*)  On examination, Kirkland had a normal range of motion, but exhibited tenderness. (Tr. 271.)  March 26, 2014 x-rays revealed multilevel degenerative changes in the lower level of Kirkland's lumbar spine.  (Tr. 281, 283.)

On April 24, 2014, Kirkland visited pain management physician Garrett LaSalle, M.D., for her lower back pain.  (Tr. 333.)  She described radiating pain down her left leg, but denied any incontinence or significant lower extremity weakness.  (*Id.*)  She relayed she had undergone a trigger point injection in March 2014, but did not find it helpful.  (*Id.*)  On examination, Kirkland had a positive straight leg raise on the left and 5/5 strength in her lower extremity muscle groups.  (Tr. 334.)  Dr. LaSalle concluded Kirkland "appears to have some myofascial

pain superimposed on a left lumbar radiculitis. (*Id.*) He prescribed Ibuprofen 800 mg and advised Kirkland he would not prescribe opioids due to her ongoing use of marijuana. (Tr. 334, 335.) Dr. LaSalle then administered a left L4 transforaminal epidural steroid injection on April 25, 2014. (Tr. 291.)

Kirkland underwent a lumbar MRI on April 28, 2014, which revealed (1) a relatively large central and left-sided disc extrusion at L4-5; (2) mild to moderate impingement of the descending L5 nerve roots, with prominent impingement on the left side of the lateral recess; (3) a normal distal cord; and (4) foraminal narrowing, greatest on the right at the L5-S1 level. (Tr. 320-321.)

Kirkland returned to Dr. LaSalle on June 2, 2014, reporting her epidural steroid injection did not provide significant relief. (Tr. 341.) On examination, Kirkland had 5/5 strength in her lower extremity muscle groups. (Tr. 342.) Dr. LaSalle ordered an EMG and referred her to physical therapy. (*Id.*) A June 5, 2014 EMG of Kirkland's left leg was normal. (Tr. 345.)

On June 30, 2014, Kirkland began a course of physical therapy with Michelle Bogomoiny, P.T. (Tr. 391.) Kirkland reported lower back pain for the past several months, along with pain radiating down her left leg. (*Id.*) On examination, her gait was "timid," particularly when arising from the seated position. (Tr. 393.) Kirkland had an abnormal range of motion in her lumbar spine and 4/5 strength in her trunk, back, and abs. (Tr. 393, 394.) She had full strength in her limbs. (Tr. 394.)

On July 3, 2014, Kirkland began a course occupational therapy with occupational therapist Christine Ontko, OTR/L. (Tr. 359.) She attended four sessions of occupational therapy

and was discharged after developing a "good understanding of proper body mechanics." (Tr. 360.)

Kirkland returned to Dr. LaSalle for pain management on July 10, 2014. (Tr. 329.) She indicated an increase in pain after "walking a long distance to the clinic." (*Id.*) Dr. LaSalle noted a "significant myofascial component of pain" in the paraspinal musculature of the lumbosacral spine. (Tr. 330.) He prescribed Kirkland a TENs unit and recommended she continue physical therapy. (*Id.*)

Kirkland attended aquatic physical therapy in July and August 2014. (Tr. 347, 356, 371, 378.) By her sixth visit, Kirkland had developed improved postural awareness and tolerance for the pool exercises. (Tr. 357.) On July 28, 2014, she reported the intensity of her pain had decreased. (Tr. 369.) On August 4, 2014, Kirkland had excellent form during her physical therapy session and was able to properly execute each exercise. (Tr. 376.)

Kirkland then underwent a left piriformis muscle injection. (Tr. 498.) On October 20, 2014, Kirkland visited Dr. LaSalle, reporting "near 100%" relief the injection. (*Id.*) On examination, Kirkland's sensation was intact, she had 5/5 strength in her lower extremities, and negative straight leg raises. (Tr. 499.) Dr. LaSalle concluded "the fact that she obtained almost 100% relief from the prior left piriformis muscle injection seems to indicate that the cause of her pain emanating from the piriformis muscle." (*Id.*) Dr. LaSalle scheduled Kirkland for a second piriformis muscle injection. (Tr. 500.)

Kirkland participated in her nineteenth physical therapy visit on November 3, 2014. (Tr. 504.) She had an antalgic gait at the beginning of the session, but her gait was normal upon completion of her exercises. (Tr. 504, 505.) She returned to Dr. LaSalle on November 5, 2014,

again reporting "100% relief" for four months following her piriformis injection. (Tr. 509.) Dr. LaSalle administered another left piriformis muscle injection at that time. (Tr. 514.)

On November 7, 2014, Kirkland returned to physical therapy, indicating she had "made no gains" in decreasing her pain levels from therapy. (Tr. 542.) However, Kirkland had improved postural alignment and awareness. (*Id.*)

Kirkland visited the emergency room on November 20, 2014, reporting shortness of breath and sinus drainage. (Tr. 551.) She was wheezing upon examination, but was not in respiratory distress. (Tr. 554.) The emergency room physicians administered a nebulizer treatment and ordered a chest x-ray, which was negative. (*Id.*) Kirkland was discharged with a course of Prednisone. (*Id.*)

On December 12, 2014, Kirkland visited primary care physician Lacey Neugebauer, D.O., for a routine physical examination. (Tr. 566.) She reported pain, a history of migraines, and asthma. (Tr. 566, 567.) Kirkland also indicated she was also having blurred vision for the past few months. (Tr. 567.) On examination, she had full strength in her upper and lower extremities. (Tr. 569.) Her reflexes and gait were normal. (Tr. 570.) Dr. Neugebauer prescribed Electriptan for Kirkland's migraines and an inhaler for her asthma. (*Id.*) Kirkland's vision appeared to be preserved on examination and Dr. Neugebauer referred her to an ophthalmologist. (Tr. 571.)

Kirkland saw Dr. LaSalle on December 18, 2014, indicating she had been doing well for "several weeks," but that day, had felt a "pop" sensation and was unable to ambulate. (Tr. 581.) On examination, Kirkland had "exquisite pain on palpation over the spinous processes" of the lumbar spine and a positive straight leg raise and decreased sensation in her right leg. (Tr. 582.)

Dr. LaSalle transferred her to the emergency room for further treatment. (*Id.*) In the emergency room, Kirkland had a normal lumbar range of motion, normal strength, and normal reflexes. (Tr. 593.) An x-ray indicated no acute pathology. (Tr. 596.) She was diagnosed with a lumbar strain/lumbar radiculitis. (Tr. 593.) Upon discharge, Kirkland stated "I feel good now, I don't hardly feel any pain no more." (Tr. 590.)

On April 21, 2015, Kirkland underwent a physical capacity evaluation with occupational therapist Lidiya Kanarsky, O.T. (Tr. 402-405.) Kirkland reported lower back and lower extremity pain. (Tr. 402.) On examination, Kirkland's cervical range of motion was within normal limits, her ability to bend forward and backward was decreased, and her straight leg raises were abnormal. (Tr. 404.) Her bilateral upper and lower extremity strength was 4/5 throughout. (*Id.*) She was able to tolerate 45 minutes of sitting during the evaluation, 20 minutes of which were uninterrupted. (*Id.*) She did not report an increase of symptoms with sitting. (*Id.*) She was able to walk 50 feet, stand for 7 minutes, and walk for 5 minutes. (*Id.*)

Based upon this evaluation, Ms. Kanarsky concluded the following:

Mrs. Kirkland's performance on this Physical Capacity Evaluation was consistent with full time, light job task[s]. This client would be able to lift and/or carry 32 [pounds] occasionally, with frequent lifting and/or carrying up to 16 [pounds]. It would be recommended to this client to alternate any repetitive tasks with non repetitive and to use the proper body mechanics with any functional activities. The client may benefit from another course of Physical Therapy aquatics as a conservative approach to her pain relief.

(Tr. 405.)

Kirkland returned to Dr. LaSalle on April 22, 2015. (Tr. 643.) She reported she had been using her community gym to perform her water therapy exercises. (*Id.*) On examination,

she had positive straight leg raises bilaterally and 5/5 strength in her bilateral lower extremities. (Tr. 644.)  Dr. LaSalle recommended a lumbar epidural steroid injection.  (*Id*.)

On May 12, 2015, Kirkland underwent an occupational therapy evaluation of her upper extremities with Ms. Kanarsky.  (Tr. 653.)  The range of motion and coordination in her upper extremities were normal.  (*Id*.)  Her bilateral upper extremity strength was decreased, measuring at 4/5 throughout.  (*Id*.)

On May 15, 2015, Kirkland began another course of physical therapy for her lower back with physical therapist Michelle Bogomoiny, PT.  (Tr. 658.)  Kirkland reported her legs had been giving out on her.  (*Id*.)  Ms. Bogomoiny noted Kirkland walked "briskly and cheerful" into occupational therapy just three days prior.  (*Id*.)  On examination, Ms. Bogomoiny noted "ALL movement is severely limited today, SEVERE PAIN, [especially] when first rising after a period of sitting."  (Tr. 660.)  Kirkland subsequently underwent a lumbar epidural steroid injection on May 20, 2015.  (Tr. 669.)

Kirkland returned to physical therapy on May 26, 2015, with an improved tolerance for bending and squatting.  (Tr. 698.)  She attended a session of aquatic therapy on May 28, 2015. (Tr. 702.)

On May 29, 2015, Kirkland visited Dr. Neugebauer for medication refills.  (Tr. 706.)  She reported only minimal relief from her headaches with her medications.  (Tr. 709.)

Kirkland saw Dr. LaSalle on June 18, 2015, reporting her recent injection only improved her condition for one day.  (Tr. 726.)  On examination, she had pain with palpation of the bilateral sacroiliac joints, but full strength in her lower extremities.  (*Id*.)  Dr. LaSalle referred her to a neuromuscular clinic for further evaluation.  (*Id*.)

As noted *supra*, Kirkland was hospitalized from June 22 through June 29, 2015 for severe depression. (Tr. 463.) During her hospitalization, she underwent several diagnostic tests for her back pain. A CT of her cervical spine revealed C5-6 discogenic disease and uncovertebral joint arthrosis with mild left lateral canal narrowing and foraminal narrowing bilaterally. (Tr. 457.) A CT of her lumbar spine indicated degenerative changes, along with a disc extrusion extending along the posterior aspect of the L5 vertebral body. (Tr. 459.) A MRI of the lumbar spine revealed (1) multilevel discogenic and facet hypotrophic degenerative changes; (2) a slight interval decrease in the disc of the disc extrusion at L4-5, with persistent impingement upon the left L5 and possibly left S1 nerve roots; (3) possible abutment of the right L5 nerve root; and (4) moderate to severe bilateral foraminal narrowing and disc herniation at L5-S1, which abutted, but did not compress, the bilateral S1 nerve roots. (Tr. 462.)

Kirkland followed up with Dr. Neugebauer after her hospitalization on June 30, 2015. (Tr. 766.) Kirkland reported improved mood with medication. (Tr. 770.) Dr. Neugebauer listed Kirkland's asthma as "mild, intermittent [and] stable." (*Id.*) Dr. Neugebauer also inserted the following discussion in her treatment note:

> Regarding patient's request for disability paperwork, explained and discussed results of her functional capacity exam. Results indicate that Ms. Kirkland's performance was consistent with full time, light duty work. In my opinion, there is no necessity for disability at this time and I agree with the occupational therapist's recommendations. Letter drafted for patient's lawyer regarding results of functional capacity exam and documentation that if patient should need further testing to be done that she should see a social security disability approved physician. Also documented that if patient is seeking disability for psychiatric issues, that this should be handled by her psychiatrist as that is the physician caring for her depression.

(Tr. 770-771.)

That same day, Dr. Neugebauer provided the following statement for Kirkland's attorney:

> Ms. Kirkland was seen in my office 6/30/15 regarding disability paperwork. As part of our office evaluation of Ms. Kirkland, a comprehensive evaluation was performed via physical capacity exam by our occupational rehabilitation department. It is their opinion that Ms. Kirkland's performance was consistent with full time, light job tasks. I am in agreement with our occupational therapist's evaluation.
>
> Any further workup of disability must be evaluated by a social security approved disability physician as our office does not handle full disability evaluations.
>
> Any mental health concerns that would pertain to her disability must be handled by her clinical psychiatrist.

(Tr. 408.)

On July 8, 2015, Kirkland visited Dr. LaSalle, reporting left-sided facial numbness. (Tr. 780.) Dr. LaSalle noted an EMG taken during her recent hospitalization revealed left L4, L5, and possibly S1 radiculopathies. (Tr. 782.) Dr. LaSalle ordered a brain MRI and referred Kirkland to a neurosurgeon. (*Id*.)

Kirkland subsequently cancelled several physical therapy visits, due to her facial numbness and upcoming surgical consultations. (Tr. 789, 792.) She reported physical therapy had "not made a significant or lasting effect on her back health." (Tr. 789.) Kirkland was ultimately discharged from physical therapy on August 24, 2015. (Tr. 804.)

On August 21, 2015, Kirkland visited Dr. Neugebauer, reporting she had discontinued all of her medications due to a "crawling" sensation on her skin. (Tr. 795.) She indicated she was under increased stress and had not informed her psychiatrist she had stopped her medications. (*Id*.) Dr. Neugebauer surmised the sensation "may be a result of her chronic pain versus discontinuation of Zoloft" and advised Kirkland to discuss this with her psychiatrist. (Tr. 799.)

Kirkland then consulted with a neurosurgeon, who concluded she was not a good candidate for back surgery. (Tr. 817.) However, Kirkland was determined to be suitable for the Chronic Pain Rehabilitation Program at the Cleveland Clinic. (*Id*.)

On January 4, 2016, Kirkland reported to Dr. LaSalle she was starting the Chronic Pain Rehabilitation Program the following week. (Tr. 823.) Dr. LaSalle prescribed her Lodine to relieve her pain in the interim. (Tr. 824.) Dr. LaSalle advised Kirkland he would not prescribe "opioid pain medications secondary to lack of efficacy for chronic musculoskeletal pain, and positive urine toxicology screening for marijuana in August 2015." (*Id*.)

Kirkland began the Chronic Pain Rehabilitation Program on January 12, 2016. On that date, she underwent an evaluation with physical therapist Elizabeth O'Dougherty, P.T. (Tr. 833.) During the evaluation, her affect was blunted and she was rocking in her chair. (Tr. 834.) She had a decreased range of motion in her cervical, lumbar, and thoracic spine. (Tr. 835.) She had slightly decreased strength in her lower extremities, an antalgic gait, but no assistive device for ambulation. (Tr. 836.) She displayed a severe loss of lumbar flexion and her hip strength was significantly decreased. (Tr. 837.) Ms. O'Dougherty concluded Kirkland would benefit from core strengthening and general conditioning. (*Id*.)

Kirkland also underwent an occupational therapy evaluation with occupational therapist Manisha Argarwal, OT. (Tr. 842.) During the evaluation, she had decreased shoulder strength and was able to lift and carry 10 pounds. (Tr. 846.) Ms. Argarwal concluded Kirkland would benefit from upper extremity strengthening and postural training. (*Id*.)

While in the Chronic Pain Rehabilitation Program, Kirkland participated in either physical therapy or occupational therapy sessions on a nearly daily basis. (Tr. 851, 855, 860,

864.)  During her therapy sessions, she would perform stretching exercises and aquatic therapy. (Tr. 852, 860.)  She worked with good effort, and within a few days, her endurance, postural alignment, and activity tolerance had improved.  (Tr. 864, 868.)  She also engaged in weight training, and by January 18, 2016, her lifting and carrying tolerance had increased to 18 pounds. (Tr. 871, 877.)  Kirkland also continued to receive psychotropic medications and mental health counseling through this program.  (Tr. 35, 840.)

On January 19, 2016, physical therapist assistant Richard Mercadante, PTA, assessed her progress after a week in the program.  (Tr. 880.)  Her lumbar spine had a moderate loss of flexion and extension.  (Tr. 881.)  She had a mild limp, but was able to walk without an assistive device.  (*Id.*)  Mr. Mercadante concluded Kirkland had made "good progress" with "improved body mechanics."  (*Id.*)

Kirkland continued to attend therapy on a near-daily basis in January 2016.  (Tr. 886, 889, 897.)  She participated in group stretching, aerobic exercise, weight lifting, and aquatic therapy.  (Tr. 889, 897, 901.)  On January 22, 2016, occupational therapist Patrick Baker, OT, noted Kirkland had an increased range of motion.  (Tr. 910.)  She was ambulating with a cane, but also exercising on a treadmill and stair stepper.  (Tr. 913.)

On January 25, 2016, Kirkland was able to lift 18 pounds during her weight training sessions.  (Tr. 922.)  Occupational therapist Aaron Nicka, OTR/L noted Kirkland had "missed some appointments which seems to be resulting in slow progress of lifting goal."  (*Id.*)  Kirkland also reported some left knee swelling.  (Tr. 927.)  Upon examination, she had a full range of motion in her knee, but increased pain with flexion and swelling along the lateral to patellar tendon.  (Tr. 928.)

On January 27 and 28, 2016, Kirkland continued to be "working steady towards goals" and displaying "improved postural awareness." (Tr. 941, 949.) On February 2, 2016, physical therapist assistant Mercadante noted Kirkland was meeting her goals, working well in all classes, and demonstrating good exercise tolerance. (Tr. 956, 957.) Kirkland reported a 50% improvement since the beginning of her program, as well as plans to join a fitness center to continue to exercise upon discharge. (Tr. 957.) On February 3, 2016, Kirkland participated in group stretching and rode a recumbent bike. (Tr. 965.) She was ambulating with a cane during the session. (*Id.*)

### C. State Agency Reports

On August 7, 2014, state agency physician Lynne Torello, M.D., reviewed Kirkland's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 74-75.) Dr. Torello determined Kirkland could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 74.) She further found Kirkland could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 74-75.)

On October 28, 2014, state agency physician Gerald Klyop, M.D., reviewed Kirkland's medical records and completed a Physical RFC Assessment. (Tr. 91-92.) He affirmed Dr. Torello's assessment. (*Id.*)

### D. Hearing Testimony

During the February 18, 2016 hearing, Kirkland testified to the following:

- She last worked at Wal-Mart, stocking shelves. (Tr. 32.) She discontinued working due to back pain and leg swelling. (*Id.*) She also has worked in various factories. (Tr. 32, 33.)

- She was psychiatrically hospitalized for about 10 days in July 2015. (Tr. 34.) Following this stay, she began to see Dr. Kline for treatment. (*Id.*) She currently takes Abilify and Cymbalta for her depression. (Tr. 41.)

- She has chronic back pain. (Tr. 35.) She had undergone physical therapy and completed a chronic pain rehabilitation program. (*Id.*) She received treatment for depression within this program and graduated on February 3, 2016. (*Id.*)

- Her doctor has referred her to several surgeons, but they have indicated "surgery really is not an option" because she has "so many things going on with the back that it could cause more problems." (Tr. 37.)

- She has shooting pain down her legs when she bends. (Tr. 45.) Stretching and sitting help relieve this pain. (*Id.*) Standing for long periods aggravate her condition. (Tr. 46.) Her medications do not alleviate her pain and she does not take narcotics due to a fear of addiction. (*Id.*)

- She has been using a cane for ambulation for the past 3 weeks. (Tr. 47-48.) It was prescribed by her physical therapist. (Tr. 48.)

The VE testified Kirkland had past work as a laborer, stores (D.O.T. #922.687-058); production assembler (D.O.T. #706.687-010); and machine feeder (D.O.T. #699.687-010). (Tr. 51-52.) The ALJ then posed the following hypothetical question:

For the first hypothetical, please assume that the individual could perform light work with limits. More specifically, that person could occasionally climb ramps or stairs, but could not climb ladders, ropes, or scaffolds . . . That person can occasionally balance, stoop, kneel, crouch, or crawl.

(Tr. 55.)

The VE testified the hypothetical individual would be able to perform Kirkland's past work as a production assembler. (Tr. 56.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Kirkland was insured on her alleged disability onset date, February 20, 2014, and remained insured through December 31, 2016, her date last insured ("DLI.") (Tr. 11.) Therefore, in order to be entitled to POD and DIB, Kirkland must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since February 20, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease and moderate to severe L5-S1 left lateral recess stenosis (20 CFR 404.1520(c) and 416.920(c)).

18

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, or crawl.

6. The claimant is capable of performing past relevant work as a Production Assembler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 20, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 11-18.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston

v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of

Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.") This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Physical RFC

Kirkland first argues the ALJ erred in his formulation of the RFC when he "did not mention or adopt" several limitations provided by physical therapist Kanarsky in her opinion. (Doc. No. 13 at 8.)  She notes while the ALJ assigned great weight to the opinion of Dr. Neugebauer "who was in agreement with Ms. Kanarsky's evaluation," he did not "mention these additional limitations." (*Id.*)  Kirkland also contends "reliance upon the opinions of non-examining State Agency consultants" is "contrary to the substantial evidence test," as they did not review the entire medical record. (*Id*. at 8-9.)

The Commissioner asserts the "[a]ssessments from Ms. Kanarsky and Drs. Neugebauer, Torello, and Klyop support" the RFC. (Doc. No. 14 at 11.)  She argues the ALJ was "not required to credit or discount each of Ms. Kanarsky's examination findings." (*Id*. at 13.)  The Commissioner maintains the ALJ properly considered the opinions of the State Agency

physicians, as he "considered newer evidence before according weight to older assessments." (*Id*. at 14.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

Further, in rendering the RFC decision, the ALJ must "give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue,* 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.,* 383 Fed App'x 140, 148 (3rd Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the

impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

As noted *supra*, Kirkland underwent a physical capacity evaluation with occupational therapist Lidiya Kanarsky, O.T., on April 21, 2015.  (Tr. 402-405.)  Based upon this evaluation, Ms. Kanarsky concluded the following:

> Mrs. Kirkland's performance on this Physical Capacity Evaluation was consistent with full time, light job task[s].  This client would be able to lift and/or carry 32 [pounds] occasionally, with frequent lifting and/or carrying up to 16 [pounds].  **It would be recommended to this client to alternate any repetitive tasks with non repetitive and to use the proper body mechanics with any functional activities**.  The client may benefit from another course of Physical Therapy aquatics as a conservative approach to her pain relief.

(Tr. 405.)(emphasis added.)  On June 30, 2015, Dr. Neugebauer provided the following statement regarding Ms. Kanarsky's opinion:

> Ms. Kirkland was seen in my office 6/30/15 regarding disability paperwork.  As part of our office evaluation of Ms. Kirkland, a comprehensive evaluation was performed via physical capacity exam by our occupational rehabilitation department.  It is their opinion that Ms. Kirkland's performance was consistent with full time, light job tasks.  I am in agreement with our occupational therapist's evaluation.
>
> Any further workup of disability must be evaluated by a social security approved disability physician as our office does not handle full disability evaluations.
>
> Any mental health concerns that would pertain to her disability must be handled by her clinical psychiatrist.

(Tr. 408.)

The ALJ determined Kirkland suffered from the severe impairments of degenerative disc disease and moderate to severe L5-S1 left lateral recess stenosis.  (Tr. 11.)  After concluding Kirklands's impairments did not meet or equal a Listing, the ALJ went on to step four to

23

consider the medical evidence regarding Kirkland's physical impairments. (Tr. 13-17.) The

ALJ acknowledged Kirkland had undergone a physical capacity evaluation in April 2015 and

during the evaluation was "capable of sitting for 45 minutes without issue, 15 minutes of

standing and walking without difficulty, and could lift nearly 20 pounds without incident." (Tr.

15.) After discussing the remainder of the treatment record, the ALJ weighed the opinion

evidence as follows:

> As for the opinion evidence, great weight is given to the medical opinion
> of State agency medical consultants Lynne Torello, M.D. and Gerald
> Klyop, M.D. (3A/5, 7, 4A/5, 7, 7A/6, 8, 7A/6, 8). Both opined that the
> claimant was capable of a light exertional residual functional capacity,
> with some postural limitations. While additional evidence was submitted
> after these medical opinions were given, that evidence is consistent with
> the State agency medical consultant's medical opinion. As these medical
> opinions are consistent with the medical evidence on a whole, great
> weight is given to their medical opinions.

> Great weight is given to the medical opinion of Lacey Neugebauer, D.O.
> (9F). Dr. Neugebauer has been involved in the claimant's treatment for
> her back complaints. Based on the physical capacity examination
> performed by her facility's occupational rehabilitation department, Dr.
> Neugebauer opined that the claimant's functionality was consistent with
> light exertional work (9F). While disability is an issue reserved to the
> Commissioner pursuant to SSR 96-5p, the undersigned has considered the
> document and finds it supportive of the assessment of light exertional
> limitation discussed above in this decision. As Dr. Neugebauer has a
> thorough knowledge of the claimant's medical history as a treating
> provider, and as her medical opinion regarding the claimant's abilities is
> consistent with the record as a whole, great weight is given to her medical
> opinion.

> Great weight is given to the opinions of the physical therap[ist] that
> evaluated the claimant's functional abilities (15F/18). While physical
> therapists are not "acceptable medical sources" as defined within the
> meaning of the Regulations, they do qualify as an "other source" as
> defined by 20 CFR 404.1513(d). Furthermore, under the Regulations,
> such reports and opinions are considered "other" evidence, of less
> probative value than information from "acceptable sources," i.e., licensed
> physicians (20 CFR §404.1513). Nevertheless, the undersigned has the

discretion to determine the appropriate weight to accord this opinion based on all evidence in the record. Considering the record in its entirety, this opinion is adequately supported by objective clinical findings, other evidence, and is verified by an acceptable medical source. (9F). Therefore the undersigned accords the opinion great weight.

(Tr. 16.)

The ALJ determined Kirkland had the following residual functional capacity:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs. The claimant can never climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, kneel, or crawl.

(Tr. 13.)

The Court finds the ALJ's RFC is supported by substantial evidence. As discussed *supra*, MRIs and x-rays have established degenerative changes, disc extrusions, and nerve root impingement in Kirkland's spine. (Tr. 281, 320-321, 457, 459.) However, as noted by the ALJ, Kirkland has undergone several courses of physical therapy, which have improved her symptoms to some degree. (Tr. 864, 877, 14.) She also underwent a piriformis injection in October 2014, which provided "near 100%" relief of her symptoms. (Tr. 498.) She often has been observed with full strength in her lower extremities. (Tr. 569, 726, 334, 342, 499, 644.) Moreover, Kirkland's treating physician, an evaluating physical therapist, and the reviewing state agency physicians all concluded Kirkland was limited to a range of light work. (Tr. 15-16, 74-75, 91-92, 405, 408.) The fact all of the opinions contained in the record support the RFC is significant and provides substantial corroborative evidence for the ALJ's conclusion.

Kirkland maintains, however, remand is required because the ALJ did not include the specific limitation provided by Ms. Kanarsky of alternating "any repetitive tasks with non

repetitive and to use the proper body mechanics with any functional activities."[4] (*See* Doc. 13 at 8, Tr. 405.) She essentially asserts because the ALJ assigned Ms. Kanarsky's opinion "great weight," the ALJ was compelled to include all the limitations Ms. Kanarsky included in her report. (*See* Doc. No. 13 at 8.)

The Court rejects this argument. When an ALJ accords "great weight" to a medical opinion, the ALJ is not required to adopt every facet of the opinion expressed by the medical source. *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D.Ohio Nov.22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight"). *See also White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at * 16 (N.D.Ohio 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 at * 11 (N.D.Ohio March 19, 2013) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given great weight"). Thus, although the ALJ assigned "great weight" to Ms. Kanarsky's opinion, he did not err in implicitly rejecting one limitation from that opinion. Moreover, Kirkland does not direct the Court's attention to any treatment records or medical evidence which supports Ms. Kanarsky's conclusion regarding alternating repetitive tasks with non-repetitive ones.

---

[4] The Court notes Kirkland is not arguing the ALJ improperly weighed Ms. Kanarsky's or Dr. Neugebauer's opinion. Rather, Kirkland is arguing in assigning "great weight" to these opinions, the ALJ should have included this additional limitation in the RFC. (*See* Doc. No. 13 at 8.)

In addition, it is unclear what Ms. Kanarsky meant when recommending Kirkland alternate "any repetitive tasks with non repetitive and to use the proper body mechanics with any functional activities." (Tr. 405.) Indeed, at the hearing, Kirkland's counsel questioned the VE regarding the "concept of alternate repetitive tasks with non-repetitive tasks." (Tr. 62.) The VE responded she was "not following that form of terminology" and Kirkland's counsel conceded "I didn't know what it meant." (Tr. 62-63.)

Kirkland further asserts Dr. Neugebauer's opinion "was in agreement with Ms. Kanarsky's evaluation" and incorporated these additional limitations "by reference." (Doc. No.13 at 8.) The argument is not persuasive. Dr. Neugebauer did not incorporate these additional limitations "by reference" in her opinion. Rather, Dr. Neugebauer noted the functional capacity evaluation revealed Kirkland's performance was "consistent with full time, light jobs." (Tr. 408.) She then concluded she was "in agreement" with this evaluation. (*Id.*) She did not discuss any other observations of Ms. Kanarasky, nor she did she indicate she was adopting all findings made by Ms. Kanarsky in full. Instead, Dr. Neugebauer simply noted the evaluation was consistent with light jobs and voiced her agreement. The ALJ accurately noted this in his decision, assigned Dr. Neugebauer's opinion great weight, with a corresponding limitation of a range of light exertional limitations in the RFC. (Tr. 13, 16.)

Kirkland also argues the ALJ erred in relying on the opinions of the reviewing state agency physicians, as they did not have the complete medical record when conducting their review. (Doc. No. 13 at 8, 9.) However, this argument is "contrary to agency regulations, which state that 'administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence,

except for the ultimate determination about whether you are disabled.'" *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. Aug. 19, 2009)(citing 20 C.F.R. § 404.1527(f)(2)(I))[5]. Moreover, it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion." *Myland v. Comm'r of Soc. Sec*., 2017 WL 5632842 at *2 (6th Cir. Nov. 13, 2017). *See also Ruby v. Colvin*, 2015 WL 1000672 at *4 (S.D. Ohio Mar. 5, 2015)("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). Here, Kirkland does not argue the ALJ failed to consider the evidence post-dating the opinions of the reviewing state agency physicians. Moreover, even if she had, this argument would fail as the ALJ's decision demonstrates he considered the entire record, as he included a discussion of the medical evidence post-dating the opinions of the state agency physicians. (Tr. 15.)

In sum, merely because the ALJ's RFC deviates from one portion of Ms. Kanarsky's opinion does not lead to the conclusion the ALJ has somehow acted inappropriately. It is the ALJ's duty to assess the "residual functional capacity based on all of the relevant medical and other evidence." *See* 20 C.F.R. § 404.1545(a). The ALJ clearly articulated his reasons for finding Kirkland capable of performing work as set forth in the RFC and those reasons are supported by substantial evidence. Accordingly, Kirkland's argument the ALJ erred in formulating the RFC is without merit.

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

## B.     Mental Impairments

Kirkland next argues the ALJ erred in finding her mental impairments non-severe. (Doc. No. 13 at 9.)  She asserts the opinion of her treating psychiatrist, her course of treatment, and the GAF scores in the record all support a finding her mental impairments are severe.  (*Id*.)  Kirkland also contends the ALJ "did not have good reason to disregard" her treating psychiatrist's opinion.  (*Id*. at 9, 10.)

The Commissioner maintains the "ALJ properly found that [Kirkland's] depression was a non-severe impairment that did not cause functional limitations."  (Doc. No. 14 at 14.)  She argues the ALJ reasonably afforded Dr. Klein's opinion little weight because the "assessment was 'based on [Plaintiff's] description' of her symptoms."  (*Id*. at 16.)  She asserts the "treatment records do not provide any basis or explanation for the mental limitations" in the opinion.  (*Id*. at 17.)  Finally, the Commissioner argues the "GAF scores were not entitled to great weight because they represented examiner's subjective impressions of Plaintiff's overall functioning at specific points in time."  (*Id*.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and

speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.* "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and

non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, at step two, the ALJ concluded Kirkland's psychological impairments were not "severe." (Tr. 12.) To support this conclusion, the ALJ noted Kirkland's brief inpatient stay, her activities of daily living, and her self-reported abilities to pay attention and follow instructions. (*Id.*) The ALJ also considered the considered the four broad functional areas set forth in the disability regulations for evaluating mental disorders. (Tr. 12-13.) She found no limitations, as follows:

> The first functional area is activities of daily living. In this area, the claimant has no limitation. The claimant reports that she has no difficulties in this area, and there is nothing in the record that contradicts her statements regarding her abilities (4E/2-3). For these reasons, the undersigned finds that the claimant has no limitations in this area.

> The next functional area is social functioning. In this area, the claimant has no limitation. The claimant reports no difficulties in this area, stating that she would attend more social activities, such as going to church, but does not due to difficulties navigating stairs (4E/5). While the claimant reports difficulties with her significant other, the record indicates she was utilizing coping mechanisms from therapy to address these issues appropriately (10F). However, the claimant reports no mental impairment symptoms that prevent her from functioning socially, despite a short inpatient stay for her depression (11F). As such, the undersigned finds that the claimant has no limitations in this area.

> The third functional area is concentration, persistence, or pace. In this area, the claimant has no limitation. The claimant states that she can pay attention "for a very long time," and states that she follows written and spoken instructions very well (4E/6). There is nothing in the record that contradicts her statements regarding her abilities (4E/6). For these reasons, the undersigned finds that the claimant has no limitations in this area.

> The fourth functional area is episodes of decompensation. In this area, there is no indication that the claimant has experienced episodes of

decompensation that have been of extended duration present in the record (10F/1, 11F).  The undersigned does note the claimant's inpatient hospital stays for mental impairments, but also notes that they are voluntary, with medical providers noting that the claimant is "relatively low risk" (18F/4).

(*Id.*)

The Court finds substantial evidence supports the ALJ's conclusion Kirkland's mental impairments are non-severe.  The record reflects Kirkland presented for mental health treatment only a handful of times between her February 2014 alleged onset date and the ALJ's May 2016 decision.  In fact, the first evidence of any mental health treatment was in June 2015, over a year after her alleged onset date.  As discussed *supra*, in June 2015, Kirkland was briefly hospitalized after reporting suicidal ideation and depression.  (Tr. 463.)  She described various stressors in her life and denied any psychiatric treatment.  (Tr. 469-470.)  She improved with treatment and was discharged.  (Tr. 475.)

Following this hospitalization, Kirkland proceeded to visit psychiatrist Louis Klein, M.D., for treatment and medications.  (Tr. 409.)  For the remainder of the relevant period, she visited Dr. Klein a total of four times.  (Tr. 409, 447, 452.)  Her treatment notes indicate stress over her housing and medical condition.  (*Id.*)  In August 2015, Dr. Klein noted Kirkland's affect was brighter.  (Tr. 449.)  In December 2015, her last documented visit with Dr. Klein, Kirkland described her Thanksgiving as "enjoyable."  (Tr. 452.)  Kirkland went on to receive medications and counseling through a pain management program, but graduated from this program on February 3, 2016.  (Tr. 35.)

Kirkland argues since there are several low GAF scores contained in the record, her mental impairments should be considered severe.  (Doc. No. 13 at 9, 10.)  The Court does not agree.  While a GAF score may assist an ALJ in formulating an RFC, they are not "essential to

the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002).

Moreover, the Sixth Circuit has acknowledged the Social Security Administration "has declined

to endorse the [Global Assessment Functioning] score for 'use in the Social Security and

[Supplemental Security Income] disability programs,' and has indicated that [Global Assessment

Functioning] scores have no 'direct correlation to the severity requirements of the mental

disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. App'x 411, 415 (6th Cir. Dec.

15, 2006)(quoting *Wind v. Barnhart*, 133 Fed. App'x 684 (11th Cir. June 2, 2005).).

    Here, the ALJ acknowledged Kirkland's GAF scores in his decision, and assigned them

"little weight." (Tr. 17.)  The ALJ reasoned these scores were "an assessment of the claimant's

functioning at a specific point in time" and provided "no indication of the claimant's overall

level of functioning over an extended period."  (Tr. 17.)  This explanation is supported by

substantial evidence.  Treatment records indicate Kirkland received GAF scores of 40 in June

and July 2015.  (Tr. 412, 469.)  However, theses GAF scores were assessed at a time when

Kirkland was under high levels of stress and had just begun to take an antidepressant medication.

There is not a consistent pattern of low GAF scores in the treatment records.  In fact, updated

treatment notes indicated her affect was "brighter."  (Tr. 449.)  During an August 2015

emergency room visit, her psychological examination was completely normal.  (Tr. 798.)

    Kirkland also argues since Dr. Klein found "moderate symptoms" in his opinion, the

ALJ erred in concluding Kirkland's mental impairments are non-severe.  (Doc. No. 13 at 9.)  She

asserts the ALJ did not have "good reason" to disregard Dr. Klein's opinion.  (*Id.*)

    A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376(6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p,[7] 1996 SSR LEXIS 9 at *9). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[8] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If an ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[6] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7] SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

[8] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6thCir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, Dr. Klein, Kirkland's psychiatrist, submitted a medical opinion in February 2016. (Tr. 830-832.) Within this opinion, Dr. Klein found mild to moderate limitations for Kirkland. (*Id.*) Dr. Klein also noted twice in his assessment the limitations provided were "based on patient's description." (Tr. 830, 831.)

At step four of the sequential evaluation, the ALJ weighed Dr. Klein's opinion as follows:

> Little weight is given to the medical opinion of Louis Klein, M.D. (20F). While Dr. Klein completed a medical source statement, he also noted that he completed based on the claimant's reports as opposed to objective medical evidence. As the opinions set forth in this document are based solely on subjective complaints with no objective medical evidence, and is not a medical opinion from an objective medical source, little weight is given to this medical opinion.

(Tr. 17.)

The Court finds the ALJ properly evaluated Dr. Klein's opinion. The ALJ concluded Dr. Klein's opinion was based on Kirkland's self-reported symptoms and thus, he afforded it "little weight." (*Id.*) The Sixth Circuit has held a "doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule." *Mitchell v. Comm'r of Soc. Sec.*, 330 Fed. App'x 563, 569 (6th Cir. June 2, 2009). *See also Tate v. Comm'r of Soc. Sec.,* 467 Fed.Appx. 431, 433 (6th Cir. 2012) (affirming the ALJ's decision not to give controlling weight to an opinion that was based on subjective complaints as opposed to objective findings). As Dr. Klein noted, not once, but twice, his assessment was based upon Kirkland's description, the ALJ's determination the opinion was based upon Kirkland's self report is accurate. (Tr. 830, 831.) *See Bell v. Barnhart*, 148 Fed App'x 277, 285 (6th Cir. July 20, 2005)("There is no indication that Dr. McFadden's

opinion was supported by anything other than Bell's self reports of his symptoms. Such reports alone cannot support a finding of impairment."). This reasoning provided by the ALJ is "sufficiently specific to make clear to any clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6thCir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).

Moreover, substantial evidence supports the finding Dr. Klein's opinion was entitled to little weight. Kirkland was psychiatrically hospitalized from June 22 through June 29, 2015, after reporting severe depression and suicidal ideation. (Tr. 463.) At that time, she denied any current psychological treatment. (Tr. 469, 470.) She improved with treatment and was discharged with an antidepressant. (Tr. 490, 494.)

Following this hospitalization, Kirkland saw Dr. Klein four times for treatment. (Tr. 409, 447, 452.) Treatment notes indicate her depression and anxiety improved with medication and her affect was "brighter." (Tr. 409, 412.) A psychological examination in August 2015 was normal. (Tr. 798.) Beginning in January 2016, Kirkland entered a pain management program, where she continued to receive medications and counseling. (Tr. 35, 840.) At the hearing, Kirkland testified this treatment was helpful and she graduated from the program in February 2016. (Tr. 37, 35.)

Finally, Kirkland argues the ALJ "did not rely upon the opinion of any mental health professional" and "cannot substitute his own opinion for Dr. Klein's opinion." (Doc. No. 13 at 11.) While the social security regulations mandate an ALJ must consider each opinion contained in the record, they do not provide that an ALJ must subscribe to at least one of the opinions

37

contained in the record.  *See* 20 C.F.R. §416.927(c).[9]  The regulations provide "although we

consider opinions from medical sources . . . the final responsibility for deciding these issues is

reserved to the Commissioner."  20 C.F.R. §416.927(d)(2).

Accordingly, and based upon the totality of the evidence discussed above, the Court

finds the ALJ properly evaluated Dr. Klein's opinion and substantial evidence supports the step

two determination Kirkland's mental impairments were "non-severe."  Thus, Kirkland's

argument is without merit.

**C.      Hypothetical/Step 5 Findings**

In her final assignment of error, Kirkland argues "the ALJ's Step 5 determination is

contrary to law and not based upon substantial evidence."  (Doc. No. 13 at 12.)  She asserts the

Step 5 determination is in error for the following reasons (1) "the ALJ did not incorporate all of

Ms. Kanasky's limitations;" (2) the ALJ did not find any severe mental impairments and "did not

include in his hypothetical question any mental limitations;" and (3) the "hypothetical question

failed to ground his evaluation of [Kirkland's] 'moderate' limitations as found by" Dr. Klein and

the GAF scores.  (*Id*. at 12-13.)

These arguments are simply a reiteration of the arguments the Court has already

addressed.  As explained *supra*, the ALJ's RFC and step two findings are supported by

substantial evidence.  As the hypothetical question to the VE included the same limitations set

forth in the RFC, it is also supported by substantial evidence.  Where the hypothetical question is

_____

[9]      As noted *supra*, revised versions of these regulations took effect on March 27,
2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg.
5844 (March 27, 2017).

supported by evidence in the record, it need not reflect unsubstantiated allegations by the

claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

Accordingly, Kirkland's final assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

　_s/Jonathan D. Greenberg_　
Jonathan D. Greenberg
United States Magistrate Judge

Date: July 11, 2018